IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
                                    :         CRIMINAL NO. 11-735
      v.                            :
                                    :
KARL BRUCE EDWARDS       :
                                    :

## MEMORANDUM

On December 15, 2011, a federal grand jury indicted Defendant Karl Bruce Edwards (hereinafter "Defendant"), charging him with one count of Bank Robbery in violation of 18 U.S.C. § 2113(a)(2012). Defendant filed a Motion to Suppress evidence that was seized on August 5, 2011. Upon consideration of Defendant's Motion (Dkt. No. 17); the Government's Response thereto (Dkt. No. 18); evidence produced at a suppression hearing held before this Court on February 4 (Day I) and 5 (Day II), 2013; and the Government and Defendant's post-hearing briefings (Dkt. Nos. 28 & 29), the following Findings of Fact and Conclusions of Law are hereby rendered.

## FACTUAL FINDINGS

1. On August 5, 2011, at approximately 4:20 p.m., the Wells Fargo Bank branch located at 101 South Main Street in Phoenixville, Pennsylvania, was robbed by a single male perpetrator. The robber handed the teller a demand note that stated, "Money no die packs." The teller immediately handed over the contents of her drawer. A total of $10,730 was taken.

2. Corporal Patrick Mark responded to the bank and spoke with Laura Hilliard, the victim teller. (Day I, pp. 7; 35). Ms. Hilliard told Corporal Mark that while she was working

1

inside the bank, she had been approached by a black male, approximately five foot eight, early 40s, wearing sunglasses and a white baggy t-shirt, and carrying a white grocery bag. The male had a stubbly beard and mustache, and black hair. (Day I, pp. 8; 34; 36).

3.  The victim-teller, Laura Hilliard, was the only eyewitness to the robbery. (Day II pp. 11-12). No one else inside the bank was aware that a robbery had taken place until after the robber left the scene.

4.  There was no gun or other weapon involved in the robbery. (Day I, p. 35; Day II, p. 42), and there was no information that anyone other than the lone robber was involved in the offense. (Day II, p. 41).

5.  Officers Jason Komorowski and David Wakeley were the first two police officers to respond to the Wells Fargo Bank after the robbery. After Laura Hilliard had provided descriptive information of the robber, "flash" information was broadcast via police radio, which described the robber as a black male, age 30 to 40, wearing a baggy white t-shirt, with a white grocery bag. The description of the robber was later supplemented to include a stubbly beard and moustache. (Day I, pp. 34-35; Day II, pp. 3-4; 10).

6.  Corporal Mark, who arrived at the bank to lead the investigation, requested surveillance photographs from corporate security. (Day I, p. 36). The black and white photos arrived within the first hour and were shown to the victim teller, who looked at one or more of them closely and identified the subject as the robber. (Day I, pp. 36-37). These photos were marked as Government Suppression Exhibit 3 (GS-3).

7.  Not long after, the teller exited the rear of the bank to smoke a cigarette, and saw a man riding a blue bicycle that she recognized as the robber. (Day I, pp. 9-10). She reported the

sighting to Corporal Mark, who broadcasted the information over police radio at 5:24 p.m. (Day II, pp. 140).

8. While he was attempting to locate the man on the bike, Corporal Mark encountered Craig Green, a civilian borough employee, who also works as a firefighter for the Phoenixville Fire Department. Green advised Corporal Mark that the man on the bike was Henry "Smoove" Hampton. (Day I, pp. 11; 43).

9. Corporal Mark was aware at that time that the Hampton family lived on Hall Street, so he proceeded there himself, and also radioed other officers to do likewise, to see whether they could locate the bike and/or Smoove Hampton. Officer Komorowski, who was out ahead of Corporal Mark, located a blue bike at 8 Hall Street, and notified Corporal Mark. The residence at 8 Hall Street is located approximately 50 yards away from the Phoenixville Police Station. (Day I, pp. 12; 33; 44; Day II, pp. 4-5).

10. Corporal Mark put instructions over the radio to detain Smoove Hampton for identification purposes and to "secure the scene." Shortly after Officer Komorowski arrived, Corporal Todd Artz showed up to 8 Hall Street. Corporal Artz stated that upon his arrival, he saw a blue bicycle propped up against the home.

11. Smoove Hampton was inside the residence at 8 Hall Street when the police arrived there. A short time after the police arrived, Hampton exited the front door of 8 Hall Street, wearing a white t-shirt. Corporal Artz spoke with Hampton, who he had known for several years, and told him that he was being detained for investigative purposes, for a major incident. Corporal Artz specifically did not tell Hampton that he was being detained due to a bank robbery having taken place. (Day II, pp. 6; 31-32; 44-45).

12. Hampton was handcuffed by Corporal Artz and ushered to a white plastic chair in front of 8 Hall Street. (Day II, pp. 29; 31-32).

13. After Smoove Hampton was detained, Corporal Artz instructed Officer Stabilo to cover the back door of the residence, and he instructed Officer Sean Knapp and Officer Komorowski to conduct a security sweep inside the residence. (Day II, p. 33).

14. In response to questioning, Smoove Hampton told police that two people were still inside the house. Corporal Mark arrived on the scene and instructed officers to bring out all occupants who were still inside of 8 Hall Street. (Day I, pp.12, 45). Corporal Artz, also on the scene, directed Officers Komorowski and Knapp to enter the residence, and conduct what they termed a "security sweep" or "protective sweep" to remove the occupants from the home. (Day II,pp.7, 33). Corporal Artz remained in the front of the residence with Smoove, who was still seated.

15. Officers Komorowski and Knapp conducted a security sweep of the house. Officer Knapp shouted into the basement and asked whoever was down there to come up. Tanisha Ford-Bey exited first. After Officer Knapp yelled three more times, Defendant came upstairs. Officer Knapp instructed the individuals to go outside to the front of the house.

16. From the moment that Defendant emerged from the basement, until his arrest approximately one-half hour later, he was not free to leave. (Day II, p.50).

17. While still on his way to 8 Hall Street, Corporal Mark was advised by one of the officers on the scene that Smoove Hampton was detained at the scene. When Corporal Mark arrived at 8 Hall Street, Smoove Hampton, a black male, was outside the house in handcuffs. Corporal Mark observed Smoove Hampton seated on the sidewalk in a plastic

chair. Smoove Hampton was seated outside the house, in daylight, on a public sidewalk, in full view of anyone in the area. (Day I, pp. 12-13; 114).

18. After seeing Smoove Hampton seated outside 8 Hall Street, Corporal Mark immediately walked back to the bank to get Laura Hilliard and bring her to 8 Hall Street. The bank is less than two blocks from 8 Hall Street. (Day I, p. 13).

19. Defendant and Ms. Ford-Bey remained detained outside of the residence for at least 5-10 minutes as Corporal Mark walked from 8 Hall Street to the bank and returned in an unmarked vehicle with the victim-teller for a "show-up," to see if she could identify the perpetrator. (Day I, p. 35).

20. At 5:32 p.m., Corporal Mark drove the teller slowly by 8 Hall Street, pulled up right next to where Hampton was seated, and stopped for approximately one minute, for the teller to see if she could identify anyone. (Day II, p.141, Day I, p. 51)

21. When the car pulled up with the teller, Defendant and Ms. Ford-Bey were seated on the front stoop of 8 Hall Street, only several feet from where Henry Hampton was seated. The teller viewed all three detainees, including Defendant, for approximately one minute from a vantage point of 6 to 8 feet away. (Day I, p. 52) (Day II, p.88, D-1, D-2).

22. The teller positively identified Henry Hampton as the robber, telling Corporal Mark that she was 95% sure. At no point did the teller make any suggestion that Defendant bore any resemblance to the robber. (Day I. p.15).

23. It is Corporal Mark's recollection that Smoove Hampton was seated in a chair slightly to the east, down the hill, away from the front door of 8 Hall Street. Corporal Mark recalls that Ms. Tanisha Ford-Bey and the Defendant were further west than Smoove Hampton, closer to the corner of the building, possibly in front of the next house up the block.

Corporal Mark did not get a good look at the Defendant at that time. (Day I: pp. 14; 49-50; 55-56).

24. It is the recollection of Corporal Artz that after all three civilians were outside 8 Hall Street, there was approximately ten feet of space between Smoove Hampton and the closer of either Ms. Ford-Bey or the Defendant. (Day II, p. 35).

25. After Corporal Mark returned the teller to the bank, he retrieved the surveillance photos, GS-3, and returned to the scene. Corporal Mark viewed the photographs while looking at Smoove Hampton and stated to Officer Knapp who was present, that the person in the photographs was not Smoove Hampton. Officer Knapp viewed at least one of the frontal view photographs, or possibly two of them, and agreed with Corporal Mark, and then pointed at the Defendant, who was seated on the sidewalk and stated that the photographs were of the Defendant. Corporal Mark compared the photographs with the Defendant, and agreed with Officer Knapp. (Day I, pp. 16-17; 28-32; 37; Day II, p. 60).

26. Corporal Artz viewed the photographs that had been brought to the scene by Corporal Mark. Corporal Artz immediately concluded that Henry Hampton was not the individual depicted in the photographs. Later, Corporal Artz compared the photographs with the Defendant, and he concluded that it was, in fact, the Defendant who was depicted in the photographs. (Day I, pp. 36-37).

27. Corporal Mark ordered Smoove Hampton released from custody, and Defendant was placed under arrest. By 5:51 p.m., Defendant was in custody at the police station. (Day II, p. 141).

28. In total, Defendant was detained for approximately one-half hour before his arrest.

29. After the Defendant was transported to the Phoenixville Police Station following his arrest, he was processed at the station. During the processing procedure, Officer Wakeley searched the Defendant, recovering from his socks suspected marijuana and suspected cocaine. (Day II, p.78-79).

30. At the police station, as he was being processed, Defendant identified himself using the alias "Steven Edwards." (Day II, p. 79). When he was searched, police recovered a paystub off Defendant's person, made out to Karl B. Edwards.

31. The Defendant was completely bald and did not have much of a beard or moustache at the time of his arrest. Corporal Mark would not describe the condition of the Defendant's facial hair as "stubbly," as Laura Hilliard had described that of the robber. (Day II:, pp. 62-63).

32. The police did not photograph Henry Hampton or in any way memorialize Henry Hampton's appearance before he was released. The police did describe in subsequent reports they prepared, Henry Hampton's clothing at the time he was detained. (Day I, p. 59).

33. Smoove Hampton was wearing a black hat at some point after Corporal Mark arrived at 8 Hall Street. Hampton testified that it was a black "skully" cap. Corporal Mark described Hampton's hat as a "goofy" black hat, and Mark testified that Hampton's hat looked nothing like the black hat worn by the robber in the bank surveillance photographs. For this reason, the police did not photograph or confiscate Hampton's hat as potential evidence. (Day I, pp. 42; 60).

34. After Smoove Hampton was released, he identified his brother, Tyrone Hampton, as the person having control of 8 Hall Street, and as the person who had the authority to consent to a search of the property. (Day I, p. 18).

35. Smoove Hampton, testifying under a grant of immunity from the government, testified that Willie Lee Hampton and his other brother Tyrone Hampton had control of the house at that time. (Day I, pp. 82-83).

36. Tyrone Hampton testified that he and his three brothers, Jonathan Smith, Willie Hampton, and Henry Hampton, are presently living at the residence at 8 Hall Street. Back on August 5, 2011, the same four men lived at the home, however, Tyrone Hampton was only there "off and on," staying most of the time with his girlfriend in Pottstown, Pennsylvania. (Day I, p. 155).

37. When Tyrone arrived at 8 Hall Street around 5:00 p.m., he saw Smoove in handcuffs, and he also saw Defendant outside of the house. Tyrone stated that the officer pointed to Defendant and stated "that's the one." A police officer asked Tyrone for consent to search the house and he complied, stating that he had "nothing to hide." Tyrone signed a form and the police entered the house. He does not recall whether or not he was read any particular language with respect to his rights in connection with the search. Tyrone Hampton testified that he signed the form for the police officer, that no one forced, threatened, or coerced him in order to get him to do so, and that the police treated him "in a nice way." (Day I, pp. 162-64).

38. At the time of the consent search request, Corporal Mark was not aware that Henry Hampton's bedroom was located in the basement of 8 Hall Street. (Day I, pp. 68-69).

39. Tyrone Hampton testified that his grandparents, who are deceased, own the property at 8 Hall Street. On August 5, 2011, Tyrone was living there along with Willie and Smoove Hampton, his two brothers. He stated that he is in charge of the upkeep of the house until it can be signed over to his mother. Tyrone Hampton testified that his brother Smoove was living in the basement or the second floor. Tyrone described the basement as unlocked and that he could enter the basement if he wanted. Tyrone stated that he was the only one with a key to the basement, which one could enter through the front steps or through the side of the house.

40. Upon entering 8 Hall Street after the consent form had been signed, Corporal Mark and Officer Knapp proceeded first to the basement of the residence. At a point a little past the bottom of the basement steps, the officers located a white plastic bag. Inside that plastic bag, Corporal Mark discovered two other white plastic bags. Inside one of those bags was a pair of sunglasses and a hat. Inside the other bag was a white t-shirt that was folded. The Defendant was not wearing a shirt when Corporal Mark arrived back at 8 Hall Street following the identification procedure. (Day I, pp. 22; 69)

41. After discovering the white bags and the items that they contained, in the basement, Corporal Mark ordered the consent search should be terminated, and a search warrant obtained. (Day I, pp. 22-23).

42. Officer Komorowski remained stationed at the front door of 8 Hall Street until Corporal Mark returned with the search warrant later that evening. Other officers remained stationed at the rear door to the house during the search.

43. Prior to the preparation of the search warrant affidavit, Corporal Mark and, to a lesser extent, Sergeant Brian Marshall, spoke with Ms. Ford-Bey. Ms. Ford-Bey told Corporal

Mark that she was in the basement of 8 Hall Street when the Defendant arrived at the house, and that the Defendant asked her whether she wanted to "party" anywhere. When Ford-Bey suggested a hotel room in Phoenixville, the Defendant stated that they needed to leave Phoenixville and go somewhere else. Ms. Ford- Bey also told the officers that when the police showed up at the house, the Defendant began stashing things around the basement. (Day I, pp. 23; 71-72.

44. On August 5, 2011, Sergeant Marshall applied for a search warrant for 8 Hall Street, Phoenixville, Pennsylvania. (Day I, pp. 23-24).

45. Sergeant Marshall, who was off duty at the time, was called by Corporal Mark with respect to a bank robbery investigation. Sergeant Marshall was debriefed by Corporal Mark and prepared the affidavit of probable cause and the search warrant for 8 Hall Street.

46. The affidavit of probable cause did not contain information that Laura Hilliard had identified Smoove Hampton as the perpetrator, because Sergeant Marshall was told that the perpetrator was not the individual that was seen on the bike by Ms. Hilliard.

47. Corporal Mark provided Sergeant Marshall with information that he contained in the affidavit of probable cause for the search warrant. Corporal Mark cannot specifically recall whether he told Sergeant Marshall about Laura Hilliard's 95% sure identification of Smoove Hampton, however, he does recall sitting in a room talking with Sergeant Marshall about the case, and is sure that this information "would have come up" before the affidavit was typed. (Day I, pp. 24-25).

48. Sergeant Marshall testified that when he was being debriefed by Corporal Mark, Corporal Mark did not tell him about the drive-by identification procedure involving Smoove

Hampton, or that Laura Hilliard told Mark she was 95% sure that Hampton was the bank robber. (Day II, pp. 118-19; 125).

49. Sergeant Marshall testified that, had he known that Laura Hilliard had told Corporal Mark she was 95% sure that Hampton was the bank robber, he would have included this information in the affidavit. (Day II, p. 126)

50. The information contained in the affidavit that Sergeant Marshall prepared in support of the search warrant came from investigation by other law enforcement officers, including Corporal Mark. (Day I, pp. 24-25. The information contained in the application for search warrant, and the supporting affidavit of probable cause, was true and correct to the best of Sergeant Marshall's knowledge and belief. (Day II, pp. 96-97).

51. After he completed the application for the search warrant and the affidavit of probable cause, following the established procedure in Chester County, Sergeant Marshall contacted Assistant District Attorney Anne Marie Wheatcraft, and received her approval of the affidavit before it was submitted to District Justice Hines, who approved it for probable cause and execution. (Day II, p. 107).

52. The search conducted pursuant to the warrant was executed by Corporal Mark and Sergeant Marshall. Police found cash proceeds from the bank robbery, a partial money wrapper, and a small bag of suspected marijuana from the basement of 8 Hall Street. Police also recovered the plastic bag, previously found by Corporal Mark, containing sunglasses, a hat, and a white t-shirt. From the living room, police found a clear plastic bag with pink baggies inside, suspected cocaine.

53. On August 8, 2011, again at the enlistment of Corporal Mark, Sergeant Marshall communicated with another Assistant District Attorney and was the affiant for a second

search warrant, for DNA samples from Defendant, and the seizure of specified items of Defendants' clothing: specifically, a pair of jean shorts, white socks, and sneakers. (Day II, p. 108). The second warrant was executed on August 10, 2011, and introduced as Government Suppression Exhibit 9.

54. The affidavit of probable cause for this second search warrant did not include that bank teller Laura Hilliard had made a "95% sure" identification of Henry Hampton as the bank robber during the show-up identification procedure conducted by Corporal Mark.

55. The policy in Chester County is, and was in August, 2011, to submit any search warrant to the Chester County District Attorney's Office for review and approval, prior to submitting the search warrant to the magistrate judge. (Day II, p. 107).

56. Sergeant Marshall submitted both the August 5, 2011 search warrant for 8 Hall Street, and the August 8, 2011 search warrant for the Defendant's clothing and DNA sample to the District Attorney's Office for review. He received approval for each of them. (Day II, p. 107).

57. Sergeant Marshall testified that the information that he included in the search warrant and affidavit for the Defendant's clothing and DNA sample was true and correct to the best of his knowledge and belief. (Day II, p. 108). Sergeant Marshall further testified that he did not intentionally omit any information from the search warrant and affidavit in an effort to deceive the district magistrate who would be reviewing the documents. (Day II, p. 108)

58. Smoove Hampton, who testified he has known Defendant since the 1980s, stated that Defendant phoned him around 10:00 a.m. to inform Hampton that he would come by 8 Hall Street later that day.

59. When he got to Hampton's house, the Defendant was wearing a white t-shirt and a pair of shorts. The Defendant asked to use the bathroom, and Henry Hampton let him into the basement of the home through the rear door. (Day I, p. 90)

60. Smoove Hampton testified that Defendant requested that he make a drug run on Defendant's behalf, and provided him with $80 in five-dollar bills to make the purchase. Defendant also told Hampton to find Ms. Ford-Bey. Hampton then left on his blue bike to make the purchase.

61. Smoove Hampton testified that en route to make the drug purchase on his blue bike, Hampton ran into Ms. Ford-Bey (whom he also knows well) near the library (106), and informed her that Defendant was at his house and wanted to see her. Hampton's route took him past the bank. When Hampton returned to the house, Defendant was in the basement with Ms. Ford-Bey.

62. When Henry Hampton started to leave his house again, he saw that the police had the house surrounded. When the police asked Hampton whether anyone else was inside the house, he responded that he had "people" in the basement. (Day I, p. 93-94).

63. Testifying under a grant of immunity from the government, Ms. Ford-Bey testified that she has known the Defendant for approximately four years, and that she has known Henry Hampton since she was a child. (Day I, pp. 121-22).

64. Ms. Ford-Bey testified that she saw Defendant outside of the Senior Center around 8:00 am on the morning of August 5, 2011, Defendant asked Ms. Ford-Bey if she wanted to get high, and the two proceeded to the Pickering Creek Inn, where the two smoked crack for several hours.

65. After the drugs were gone, Defendant phoned several dealers to try to make a trade for more crack.  Defendant also told Ms. Ford-Bey that he could go to the bank, but had to wait until after 3:00 p.m.  Defendant requested a pen from Ms. Ford-Bey.  Although she could not find the outside of the pen, because the two had been using the outside as a "pusher" to smoke the crack, Ms. Ford-Bey handed the Defendant the inside of the pen.  Defendant told Ms. Ford-Bey that he had to "figure some stuff out" and wrote a note on the other side of the room.  Ms. Ford-Bey and the Defendant parted ways.  (Day I, p. 128).

66. Later that afternoon, Ms. Ford-Bey stated that Smoove saw her and told her that Defendant was looking for her at Smoove's house.  When Ms. Ford-Bey arrived at 8 Hall Street, Defendant was sitting in the basement.  He was wearing jean shorts and no shirt.  Defendant asked Ms. Ford Bey if she wanted to "get high all night" and mentioned that he wanted to get a hotel room with her for the evening.  Ms. Ford-Bey suggested the Primo motel because it was cheap, to which Defendant responded that "he wasn't worried about cheap" and "wanted to get out of town."

67. Ms. Ford-Bey testified that she and the Defendant had engaged in a sex act prior to the Phoenixville Police coming into Henry Hampton's home. (Day I, p. 143).

68. Ms. Ford-Bey and Defendant were smoking crack when they heard the Police arrive.  Ms. Ford-Bey began stashing empty bags behind the TV.  She stated that upon hearing "Phoenixville PD,"  Defendant jumped up and began stashing stuff around the room and in the couch.  She did not see what exactly he was stashing.

69. Ms. Ford-Bey testified that she came up out of the basement first, and was instructed by the police to take care of the dog (believed to be a boxer; described by Ford-Bey as a "big

dog") that had been inside the house. The police had guns pointed at her at that time. The

Defendant followed shortly thereafter, and the two of them sat down outside the house

with Henry Hampton. (Day I, pp. 133-34; 149-51).

70. Ms. Ford-Bey testified that Henry Hampton was seated, handcuffed, under a lamp post

between the front door to the house, and the front window. Ms. Ford-Bey was seated on

the stoop in front of the house, along with the Defendant. (Day I, pp. 145-49).

71. A Chester County Radio Call Log was admitted as Government Suppression Exhibit 11.

This call log memorializes the radio traffic that occurred during the course of the

investigation of the robbery of the Wells Fargo Bank branch. This radio call log

establishes the following facts:

> a. The original 911 call reporting the bank
> robbery occurred at 4:28:56 p.m. on August 5,
> 2011.
> b. The first police officer was dispatched to
> the bank at 4:22 p.m.
> c. The first police officer arrived at the bank
> at 4:23 p.m. The first two officers to
> arrive at the bank were Officers Komorowski
> and Wakeley.
> d. Corporal Artz was assigned to the case at
> 4:24 p.m.
> e. The sighting of the man on the bike by Laura
> Hilliard occurred at 5:24 p.m.
> f. Information that Henry Hampton was viewed
> near the bank was broadcast at 5:24 and
> 5:25 p.m.
> g. Police officers first arrived at 8 Hall
> Street at 5:26 p.m.
> h. Henry Hampton was detained at 5:26 p.m.
> i. Laura Hilliard was transported by Corporal
> Mark to 8 Hall Street at 5:32 p.m [Tyrone Hampton signed the consent to
> search form at 5:45 p.m., and the consent search was completed at 5:54
> p.m., as per Government Suppression Exhibit #1]
> j. The search warrant was served at 8 Hall
> Street at 11:08 p.m.
> k. The search of 8 Hall Street was concluded at

1:29 a.m. on August 6, 2011.
(Day II: pp. 135-42).

## CONCLUSIONS OF LAW

Defendant seeks suppression of the physical evidence that officers found during the August 6, 2011 search of 8 Hall Street.  Defendant also seeks to suppress statement evidence made at the police station on that same day.  Defendant advances the general argument that all of the obtained evidence by police was in violation of Defendant's Fourth Amendment rights, and as such, should be suppressed at trial under the "fruit of the poisonous tree" doctrine.  Defendant argues that he has legal standing to challenge the search of 8 Hall Street; that the officers' warrantless "protective sweep" and subsequent search following Tyrone Hampton's signing of a consent form was invalid; Officers lacked reasonable suspicion to detain Defendant; and the search warrants were invalid.  The Government responds that Defendant lacks standing to challenge the search of 8 Hall Street as he has no legitimate expectation of privacy in the basement bedroom; the warrantless entry into 8 Hall Street and the subsequent detention of Defendant was constitutionally permissible; Tyrone Hampton's consent search was valid; and the search warrants at issue were valid.   For the reasons that follow, Defendant's Motion to Suppress is denied.[1]

### I.    Defendant Lacks Standing to Challenge the Search of 8 Hall Street

The Fourth Amendment guarantees an individual's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend.

---

[1] Defendant moved to suppress: 1) all physical evidence obtained from inside 8 Hall Street pursuant to a protective sweep, a consent search, and a search pursuant to a warrant ($10,619 in United States currency; a currency strap; a white plastic bag containing  sunglasses, a black hat, and a white t-shirt; bags of suspected cocaine and suspected marijuana); (2) statement evidence from Defendant; and 3) evidence seized from Defendant at the police station subsequent to his arrest, including clothing items (jean shorts, socks, sneakers, a neck chain), two glassine bags found on Defendant's person, and a DNA sample and test results pursuant to a second search warrant.

IV.  The exclusionary rule "forbids the use" at trial of evidence obtained in violation of the Fourth Amendment. *Herring v. United States*, 555 U.S. 135, 139 (2009) (citing *Weeks v. United States,* 232 U.S. 383, 398 (1914)).  To invoke the exclusionary rule of the Fourth Amendment, a defendant must first establish standing.  *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011) (citations omitted).  Fourth Amendment standing "requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched[.]" *United States v. Baker,* 221 F.3d 438, 441 (3d Cir. 2000) (citing *Rakas v. Illinois,* 439 U.S. 128, 143 (1978); *California v. Greenwood,* 486 U.S. 35, 39 (1988)).  "This applies to all searches conducted by law enforcement, and the rule applies in the 'fruit of the poisonous tree' context." *United States v. Cobb*, 2009 WL 3806764 (E.D. Pa. Nov. 12, 2009) (citing *United States v. Lampkins,* 811 F. Supp. 164, 168 (D Del. 1993).  "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 39 U.S. at 130 n.1.

Defendant claims that he has "standing to challenge the search of 8 Hall Street" because Defendant "rented the basement by paying Henry Hampton $20, so that he could have several hours of privacy with Ms. Ford-Bey."  The Government responds that the Defendant, who carries the burden of proof, has "failed to prove that he had any reasonable expectation of privacy in the residence at 8 Hall Street" because he did "did not live at 8 Hall Street, nor was he ever an overnight guest there." This Court agrees with the Government.

In some circumstances, a person, such as an overnight guest for example, may have a legitimate expectation of privacy in a residence that is not his or her own.  *Minnesota v. Olson*, 495 U.S. 91, 98, (1990) ("To hold that an overnight guest has a legitimate expectation of privacy

in his host's home merely recognizes the everyday expectation of privacy that we all share . . . [S]ociety recognizes that a houseguest has a legitimate expectation of privacy in his host's home."); *Minnesota v. Carter,* 525 U.S. 83, 88 (1998)("in some circumstances a person may have a legitimate expectation of privacy in the house of someone else."). These circumstances, however, are not present in this case.

Defendant has not established any connection to 8 Hall Street sufficient to confer a reasonable expectation of privacy. Testimony at the hearing established that Defendant did not live at 8 Hall Street nor did he ever spend the night or even leave personal possessions at the house. (Day I, pp. 87-88). The only person with a key to the basement was Tyrone Hampton (*Id.* at 188). Although Defendant provided Smoove Hampton with $80, the testimony indicates that this money was not in exchange for rental, but instead so that Smoove could make a drug run on Defendant's behalf. (*Id.* at 90). Nothing in the testimony or proposed evidence supports Defendant's assertion that Defendant "rented" the room. Defendant analogizes his presence in the house to that of a hotel guest or an overnight guest, but this is unsupported by the record. A Defendant does not have a reasonable expectation of privacy in a room of a house in which he is merely a temporary visitor. *See Carter,* 525 U.S. 83, 90 (determining that guests, "who were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours," had no legitimate expectation of privacy in the dwelling); *see also United States v. Torch*, 609 F.2d 1088, 1091 (4th Cir. 1979)("occasional presence, however, without any right to exclude others, is not enough" to establish a reasonable expectation of privacy) (citing *Rakas,* 439 U.S. at 128). Even though Defendant was there with the permission of the inhabitant of the basement, based on the short-term nature of his stay he did

not have a reasonable expectation of privacy.  As explained by the Third Circuit in *United States v. Mosley*:

> It is settled law that if the police illegally enter a house and search it, the owner or tenant of the house, or any long-term guests, may suppress evidence found during the search. ***Short-term guests, however, have no expectation of privacy in the house and therefore cannot suppress the fruits of the illegal search. This is true even if the short-term guests were seized pursuant to the illegal entry into the house***. If, for example, the police barricaded the exits to a residence, entered, and ordered everyone present to freeze, they would have thereby seized everyone present in the residence. If their entry was illegal, for example if effected without a warrant and absent exigent circumstances, then all of those seizures were illegal. However, only the owner, tenant, or long-term guests could suppress evidence found during the search. Short-term guests would face the full evidentiary weight of any evidence discovered.

*United States v. Mosley*, 454 F.3d 249, 259 (3d Cir. 2006) (emphasis added) (citing *Olson,* 495 U.S. 91).

For the Court to hold that an individual, whose short-term presence in a house for the purpose of using drugs and engaging in intercourse with another individual, has an expectation of privacy would be a vast leap from well-established Fourth Amendment jurisprudence.  One cannot conflate a preference for privacy while engaging in suspect acts, with the expectation of privacy that the Fourth Amendment confers.  Accordingly, Defendant lacks legal standing to challenge the search of 8 Hall Street and the seizure of evidence therein.

Defendant does not have Fourth Amendment standing to challenge this search because he lacked an objectively reasonable expectation of privacy in the basement of 8 Hall Street.

## II.     Police had Reasonable Suspicion to Detain Defendant and Probable Cause to Justify His Arrest.

Defendant was reasonably detained pursuant to the protective sweep of the residence.  Officers arrived at 8 Hall street and saw a blue bicycle matching the witness description.  A short time after the police arrived, Smoove Hampton exited the front door of 8 Hall Street and in

response to questioning, Smoove Hampton told police that two people were still inside the house. During the subsequent security sweep of the house, Officer Knapp shouted into the basement and asked whoever was present to come upstairs. Defendant did not immediately exit the house and only came upstairs after Officer Knapp yelled three more times. Ms. Ford-Bey and Defendant were instructed to sit outside of the house and neither were handcuffed at that time, for a period of approximately thirty minutes total.

Such a temporary detention is permissible given the circumstances. In assessing the constitutionality of an investigative detention, courts must consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Here, a bank robbery had just occurred and when police arrived they were led to 8 Hall Street, based on a variety of circumstances. The suspect in the case had presented a "demand note" to the teller and subsequently fled the scene. The suspect was initially identified as Smoove Hampton, someone who was known to the police officers. When police officers arrived at Smoove's residence, they directed Smoove to exit the house and he informed police that there were more people inside. Defendant did not immediately leave the house, and instead the police had to yell four times for him to exit the house. A lack of responsiveness to police orders can create alarm among police officers trying to secure a scene. Given the seriousness of the offense and the rapidly developing situation, it was reasonable to think that the individuals still inside the house could have been trying to destroy evidence or access a weapon (although the robber was not seen with a weapon, his demand note could infer the possible existence of one). The police acted appropriately given the "swiftly developing

situation" and any delay in detaining Defendant was not "unnecessary to the legitimate investigation of the law enforcement officers" *Id.* at 687.

Defendant's arrest was based on probable cause, given that upon inspecting the bank surveillance photos, it was clear to Corporal Mark that the individual in the photos was not Smoove Hampton as previously thought, but instead Defendant. Corporal Mark corroborated his opinion by having Officer Komorowski and Corporal Artz view the photos. Based on this corroboration, Officers had probable cause to effectuate the warrantless arrest.

## III.    Statement Evidence is Admissible

After Defendant was arrested, in response to being asked his name, Defendant responded that his name was "Steven Edwards." Defendant argues that such a statement is inadmissible because the statements made during the booking process "constitute tainted fruit" pursuant to *Wong Sung v. United States*, 371 U.S. 471 (1963). Defendant's arguments carry no weight as the Defendant's arrest was lawful and based on probable cause. Furthermore, even though Defendant was not read his *Miranda* rights before offering the false statement, that does not warrant suppression of the statement. The Court notes that "there is no requirement that the defendant be afforded *Miranda* warnings prior to being asked pedigree information as part of routing booking procedure. *United States v. Torrence*, 2012 WL 2920421 n.5 (E.D. Pa. July 18, 2012) (citing *U.S. v. Bishop*, 66 F.3d 569, 572 n. 2 (3d Cir.1995)).

## IV.    The Search Warrants and Subsequent Evidence are Valid.

There were two search warrants in this matter. Defendant cannot contest the first, which authorized the search of 8 Hall Street, because he lacks standing to contest the search of the

residence. Defendant does however, have standing to object to the second search warrant, which authorized recovery of Defendant's clothing and a buccal swab DNA sample.

Defendant argues that the search warrant was 1) based upon unlawfully obtained information; and 2) upon material information that was intentionally omitted or omitted with reckless disregard for the truth. As discussed *supra*, Defendant's argument that information was unlawfully obtained fails as Defendant lacks standing to contest the search of 8 Hall Street. The Court now addresses the second argument, that the search warrants are invalid because the supporting affidavits of the warrant were premised "upon material information that was intentionally omitted, or omitted with a reckless disregard for the truth." Defendant argues that the affidavit supporting the search warrant omitted information "that after the teller observed both individuals, she positively identified Hampton, and that the t-shirt, hat and sunglasses were found in Hampton's bedroom." (Defendants Mot. Suppress. 14 citing *Franks v. Delaware*, 438 U.S. 154 (1978).

Defendant has failed to meet his burden of showing he is entitled to a *Franks* hearing or that *Franks* violations occurred. *Franks* creates "presumption that an affidavit of probable cause supporting a search warrant is valid." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). To overcome this presumption, Defendant must first "make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *Id.* (citing *Franks*, 438 U.S. at 171). A *Franks* analysis extends to omissions as well as misstatements of fact. *Sherwood v. Mulvihill*, 113 F.3d 396, 403 (3d Cir. 1997) (citing *United States v. Knapp*, 1 F.3d 1026, 1029 (10th Cir. 1993)).

Under a *Franks* analysis, Defendant must present "sufficient evidence to establish that the omissions were "material, or necessary, to the finding of probable cause." *United States v. Sanchez*, 246 F. App'x 803, 805 (3d Cir. 2007) (citing *Sherwood v. Mulvihill,* 113 F.3d 396, 399 (3d Cir. 1997). Stated another way, an omission is "material" if it "mattered regarding the magistrate's probable cause determination." *Yusuf*, 461 F.3d at 389. To determine whether the omissions are material, the Court must "insert the missing information, and then examine whether or not the "corrected" warrant affidavit would establish probable cause." *Sanchez*, 246 F. App'x at 805 (*citing Yusuf*, 461 F.3d at 384).

Here, even if the affidavit included information that 1) the bank teller made a "95% positive" identification of Smoove Hampton; and 2) the location where the items were recovered was Smoove Hampton's bedroom, these facts would not change the fact that the Magistrate Judge would have found probable cause within the affidavit.

The affidavit states as follows:

> That on Friday, August 05, 2011 at approximately 4:21p.m.; the Phoenixville Police Depratment [sic] received a dispatch for a bank robbery at the Wells Fargo Bank 101 S. Main Street Phoenixvile, PA 19460. The teller at Wells Fargo working station #5 was interviewed and stated that a black male walked into the bank and produced a note on a manila [sic] envelope or dirty white paper that read," Money no die packs". The black male then utterd [sic] to the teller, " I want this don't do anything [sic] stupid." The teller was extremely scared for her safety and handed him money from her drawer. The subject took the money and placed it into a white plastic bag along *with* the demand note. He then walked out the front door.
>
> The teller described the black male's physical attributes as approximately 5' 8 in. tall weighing approximately 180 pounds, aged late 30's to mid 40's. The subject had a "stubbly" beard and mustache. He was wearing a short-sleeved shirt, sunglasses, and a black cap with a brim in the front.

The teller related that some of the currency was wrapped with paper bank straps in thousand dollar increments. Management of Wells Fargo audited teller drawer five and determined that $10,730 was taken in the robbery.

At Approximately 5:25 p.m., the teller was outside the bank and notified the police and reported that a black male subject riding a blue bicycle east on Church Street looked like the man who just robbed the bank. Phoenixville police officers located a blue bicycle parked in front of 8 Hall Street moments later.

Officers obtained a written consent from the owner of the residence, Tyrone Hampton, to search the residence. A black male was located in the basement who matched the discription [sic] and was identified as Karl Bruce Edwards DOB 05/12/1959.

Hampton stated he does not know Edwards and staed [sic] Edwards does not live at that address. During the consent search officers did find a black hat and sun glasses, in a white plastic bag, which appear identical to the items worn by the bank robber from photos obtained from the Wells Fargo surveillence [sic] system. Also located in that same white plastic bag was a white tee shirt.

Karl Bruce Edwards DOB 05/12/1959 was placed under arrest after being positively identified by Cpl. Patrick Mark from surveillance (sic) photos obtained from Wells Fargo Bank.

It was unknown to officers at the time of the consent search if any of the residents, including the owner, were also involved in the robbery. A decision was then made to secure the residence and apply for a search warrant.

A search warrant was obtained for the residence from the Honorable Chester County Judge Gregory Hines. The search warrant was executed on the premise and the following items relating to the bank robbery were seized in the basement area where the only male, Karl Bruce Edwards, was found:

One black brimmed hat
One pair of sunglasses
One white crew neck tee-shirt
One white plastic "Family Dollar" bag
$10,619.00 in U.S. currency
A partial piece of a white and blue paper money strap with $100 marked on it.

On August 8, 2011, your affiant spoke to an employee, Kathleen Apgare, at Wells Fargo Bank. She related that their company uses white and blue paper money straps with "$100" marked on the strap for binding one dollar bills. One dollar bills were taken during the robbery which were wraped [sic] with money straps.

On August 8, 2011, your affiant received the full surveilence [sic] videos including the videos captured outside the Well Fargo Bank [sic]. After viewing the videos, it was determined that Karl Bruce Edwards was wearing jean shorts, white ankle socks, and sneakers during the robbery. When Edwards was placed under arrest it appears that he is wearing the same color sneakers, white socks, and jean shorts. You [sic] affiant confirmed this by viewing the Phoenixville Police Department's video of patrol officers bringing Edwards into the station.

Based on the set of facts and circumstances described above, it is your affiants [sic] opinion that the collection of the clothing worn by the defendant is necessary for the preservation of what is believed to be the clothes worn during the robbery. Also, it is very likely that the hat, sunglasses, and tee-shirt contain DNA and a sample of DNA from the defendant will aid with the investigation through DNA comparison testing.

(Government Suppression Ex. 9).

Even if the affidavit included the information that Defendant claims was omitted, that information would not undermine the search warrant's probable cause. As the affidavit states, 1) Defendant matched the teller's description of the robber; 2) Corporal Patrick Mark identified Defendant after reviewing surveillance photos obtained from Wells Fargo Bank; 3) Defendant was seen in the vicinity of the recovered items at 8 Hall Street; and 4) at the time of his arrest, Defendant was wearing clothing matching that seen on the surveillance video from Wells Fargo Bank. Given the high standard set forth in *Franks*, Defendant has failed to demonstrate that the addition of the disputed information would at all negate the great weight of the affidavit supporting probable cause. *See United States v. Brown*, 2:08-CR-299, 2011 WL 3678682 (W.D. Pa. Aug. 19, 2011) (omission of possible suspect from affidavit did not negate probable cause under affidavit in light of "totality of the circumstances" set forth in affidavit). This Court finds that the omissions from the affidavit were not material to the determination of probable cause. As such, Defendants' Motion to Suppress the evidence seized pursuant to the search warrant and any subsequent test results is denied.

An Appropriate Order follows.